**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | Case No. 2:15-cr-00132 |
| ) | |
| **CINDY HALL** ) | |
| ) | |
| **Defendant.** ) | |

## DEFENDANT'S POSITION ON SENTENCING

Pursuant to Title 18 U.S.C. § 3553(a), Federal Rule of Criminal Procedure 32, and Section 6A1.3 of the United States Sentencing Guidelines, the Defendant, Cindy Hall, ("Ms. Hall") by and through her attorneys, states that she has received and reviewed the Pre-Sentence Report ("PSR") prepared in this case. Ms. Hall objects to the PSR as described below. Based on Ms. Hall's background, acceptance of responsibility, need to care for her children, and significant restitution obligation, a sentence of probation is sufficient, but not greater than necessary in this case.

## OBJECTIONS TO THE PRE-SENTENCE REPORT

1. Ms. Hall objects to the one level increase under §2S1.1(b)(2)(A) in paragraph 28 based on the parties' agreement that the 10-point loss enhancement was the only enhancement that applies. Therefore, counsel submits that the appropriate and fair calculation of the Offense Level is contained in the Plea Agreement, resulting in a level 14 (Base Level 7 + 10 Loss Amount = 17 – 3 for acceptance = 14). The overall resulting calculation is Offense Level 14, Criminal History Category I, with a resulting Guidelines range of 15-21 months.

2. Ms. Hall objects to the inclusion of Paragraph 82 of the Pre-Sentence Report, which includes an excerpt of a letter from her abusive and manipulative estranged husband, Benjamin Hall. Mr. Hall is not a victim in this case and has no standing to submit a victim impact statement to this Court or ask for any particular sentence. Moreover, the Court should view with great skepticism his allegations and accusations. For instance, the PSR notes he says Ms. Hall "is not a decorated Navy veteran and made up her own awards . . ." However, as seen in Paragraph 69 of the PSR, Ms. Hall's official government record of her time in the Navy, the DD-214, reflects that she received the following awards:

> Navy/Marine Corps Achievement Medal (5); Navy Good Conduct Medal (6); National Defense Service Medal (2); Global War on Terrorism Service Medal; Navy Sea Service Deployment Ribbon; USCG Special Operations Service Ribbon; Navy Expert Rifleman Medal; Navy Expert Pistol Medal; Enlisted Surface Warfare Specialist; and Enlisted Aviation Warfare Specialist.

The other conclusions included by the probation officer in Paragraph 82 are baseless, angry accusations, uncorroborated (and cannot be corroborated because they are untrue), and it would be reckless to maintain them in the PSR. Ms. Hall has a current restraining order against Mr. Hall due to his physical and mental abuse. We respectfully request that the Court strike this paragraph from the PSR and pay no heed to this smear campaign when fashioning a fair sentence in this case.

## BACKGROUND

On October 8, 2015, Ms. Hall was indicted on fifteen counts of mail and wire fraud and unlawful monetary transactions. Ms. Hall pled guilty pursuant to a plea

agreement on February 3, 2016 to Counts Two and Fourteen, mail fraud and unlawful monetary transactions.

## ARGUMENT

I. **Legal Standard**

Since the Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise. While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005), district courts must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 50 (2007). The Guidelines range is but one of several factors a court must consider when imposing a sentence, and it is legal error to treat those ranges as default sentences. *See United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009). A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing a sentence.

Taking into account the factors enumerated in § 3553(a), which state that a judge must "impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007). A below-Guidelines sentence may be appropriate if the Court determines that the Guideline sentence "falls outside the 'heartland' to which the Commission intends

3

individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors." *Rita v. United States*, 551 U.S. 338, 351 (2007)(citation omitted).

The factors for the district court to consider include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the Guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to the defendant and others, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a). The Court must weigh each of these factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to §3553(a). *Id.*

## II.     Ms. Hall's History and Characteristics

Ms. Hall was born on March 18, 1974, and struggled with poverty her entire childhood. Ms. Hall had four siblings, and the only sustenance the family sometimes had in a day was sugar water and mayonnaise sandwiches. In addition to lacking basic necessities, Ms. Hall's mother provided little emotional foundation for her and even disregarded Ms. Hall's claims of sexual and physical abuse.  Ms. Hall was sexually molested by her aunt's boyfriend when she was six years old.  She attempted to tell both her mother and her aunt, however, both simply disregarded and ignored her deep suffering and physical pain.  In response, Ms. Hall became increasingly distant. As a

coping mechanism, Ms. Hall devoted herself to school and frequently enrolled in summer classes to be away from home. This is a stark contrast to similarly situated individuals who often take a more destructive path.

Ms. Hall's difficult upbringing was further exacerbated when, at the age of sixteen, Ms. Hall became pregnant and was forced out of her home by her mother. Ms. Hall remained homeless for the majority of her pregnancy until she was taken in by one of her older siblings, who has since passed away. Unfortunately, because of her living situation, Ms. Hall was unable to obtain public assistance and lived off of simple foods, such as crackers and macaroni. Despite these hardships, Ms. Hall obtained her high school diploma and maintained aspirations of receiving a college degree.

In an effort to improve her life and provide for her child, Ms. Hall entered into the military. Ms. Hall was trained in Aviation Maintenance Administration and performed admirably in this position for twenty years, until her Honorable retirement in 2012. Over the twenty years Ms. Hall served, she developed Post-Traumatic Stress Disorder and Major Depressive Disorder from sexual trauma inflicted upon her. PSR ¶ 13. While in the military, Ms. Hall dated another man who was eventually investigated on the matter of fraternization. The man provided intimate details about Ms. Hall, about her body and her habits. This report was publicized and made available to thousands of individuals, which worsened her depression.

Also while serving in the military, Ms. Hall married, and mothered an additional four children, despite miscarrying six times as a direct result of domestic abuse. She has since divorced the husband, but receives no child support for her children. Ms. Hall's youngest child is ten years old.

5

Ms. Hall attended Florida State College, but withdrew from her courses in order to meet motherly and military duties. In her position as Chief Administrator and Legal Assistant, Ms. Hall was described as professional and beyond reproach. *See* Def.'s Ex. 1, *Letters on Behalf of Cindy Hall* at 3. Her superior officer considered her his "go-to" person in high stress situations and has expressed unreserved support of her character. *Id.* This high regard for Ms. Hall is not limited to only her superior officers. Her peers within the Navy have also come forward to offer support to her strong character, and faith that, given Ms. Hall's experiences, she is remorseful and willing to make amends. Id. at 4–5.

In Ms. Hall's personal life, she makes a concerted effort to support her children by attending their sporting events and providing a life she was denied. However, Ms. Hall is the sole caretaker of her children and presently has no significant other, which places a strain on both her finances and medical well-being. Ms. Hall suffers from diabetes, high blood pressure, and a vitamin-D deficiency, which she takes prescribed medication to treat. PSR ¶ 13. These medications create additional expenses that Ms. Hall's current income can barely accommodate alongside her children's needs.

Since her retirement from the military in 2012, Ms. Hall has worked as an executive assistant, which has allowed her to treat her medical conditions and provide for her five children. During her employment in this position, Ms. Hall has been referred to as an angel. She was always willing to help those in need, and encouraged those going through hard time. *See* Def.'s Ex. 1 at 1. Often she would counsel those in difficult times by talking about her children, or events she had volunteered at the previous weekend. *Id.* Ms. Hall always made time to provide assistance to these individuals,

6

whether through being an open ear, or actively helping them find new employment. *Id.* Ms. Hall currently volunteers with her daughter's basketball team. She has devoted 500 hours of her time, and purchased uniforms and hotels rooms for players who could not afford them. Ms. Hall's efforts helped provide less fortunate players with critical exposure to college basketball coaches, and resulted in two of the players receiving full ride scholarships to Division 1 schools.

In terms of the offense, Ms. Hall accepted responsibility for her offense and acknowledged that she will pay the restitution damages in full. This will put immense strain on both her and her children. Ms. Hall's life has been filled with turmoil, neglect, starvation, and abuse, but up until recently, she made good life choices in order to provide for her and her family. Even the offense conduct was a result of Ms. Hall attempting to provide for her family.

Imposition of incarceration would extend beyond a punitive punishment on Ms. Hall and impede her children's ability to receive daily needs and adequate care. She has no prior felonies, no history of substance abuse, and has proven to be a reliable mother and driven individual through her service in the military and providing meals to underprivileged children, but in lesser quantities than reported. *See* Def.'s Exhibit 1 at 1– 5. If the Court were to impose incarceration, Ms. Hall's debt would further increase; thereby, frustrating the government's likelihood of recovering the restitution amount. Additionally, Ms. Hall requests that interest be waived on the restitution amount to allow the principle amount to continue to be paid off with each payment.

It is because of these personal trials and accomplishments, and her life of service, that Ms. Hall should be afforded the ability to continue caring for her family, while

finding suitable employment for her skillset to make the government whole. By allowing Ms. Hall to seek new employment and care for her children, the Court would be imposing a punishment that allows for Ms. Hall's rehabilitation, and does not compromise her children's wellbeing or the government's remedy.

**III.     Nature and Role In The Offense**

Ms. Hall has not received an enhancement for an aggravating role in this offense. It should not be overlooked that she did, in fact, assist in feeding hundreds of underprivileged children.  Ms. Hall recognizes that she should not have inflated the numbers of meals served, and is deeply remorseful for her actions.

**IV.     Table 2B1.1 is Severely Flawed and Offers No Useful Guidance on Sentencing.**

Ms. Hall's advisory guideline range is driven in large part by a single enhancement for the value amount under USSG § 2B1.1.  This fraud loss guideline contains severe flaws.   The guideline range offers no useful advice because it (1) is not based on empirical evidence or national experience; (2) uses the highly imperfect measure of "loss," to determine the seriousness of the offense; (3) has been widely discredited, (4) and prescribes punishment that is grossly disproportional to the offense and far greater than necessary to promote the goals of sentencing in this case.  Together these flaws produce a guideline that is manifestly unjust.

### *A.     §2B1.1 Is Not Rooted In Empirical Evidence*

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. §91(b)(1)(A), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." 28 U.S.C. §

994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16). The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id*. at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall*, 552 U.S. at 46, n.2; *Kimbrough*, 552 U.S. at 96. When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence

'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 109-10.

The fraud guideline is not based on empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Spears*, 129 S. Ct. at 843; *Kimbrough*, 552 U.S. at 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Breyer, 17 Hofstra L. Rev. at 22-23. The Commission required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0-6 months and no more than 30-37 months for defendants in Criminal History Category I. See USSG § 2F1.1 (1987). The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004) (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement.").

The Commission's deterrence rationale was not based on empirical evidence. The

10

empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995) [hereinafter *Specific Deterrence*]. "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) [hereinafter *Restorative Justice*].

### B. *"Loss" is a Highly Imperfect Measure of the Seriousness of the Offense and Overlaps With Other Enhancements*

The amount of "loss" is the primary determinant of the offense level for fraud offenders, however, loss is a highly imperfect measure of the seriousness of the offense. *See United States v. Gupta*, 904 F.Supp.2d 349 (S.D.N.Y. Oct. 24, 2012) ("By making a Guidelines sentence turn on this single factor [loss or gain], the Sentencing Commission ignored [§3553(a)] and . . . effectively guaranteed that many such sentences would be irrational on their face."); *Adelson*, 441 F. Supp. 2d at 509 (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004).

Defendants rarely set out to defraud others of a specific amount of money; rather, the amount of loss is dependent on the security procedures in place and the point in time when the fraud happens to be detected. *Id.* "Had [the defendant] been caught sooner, he

11

would have stolen less money; had he not been caught until later, he would surely have stolen more." *Id*. "The problem is that loss has taken on a role in the sentence calculation that dwarfs most of the other important factors." David Debold & Matthew Benjamin, *''Losing Ground''—In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. Pa.L.Rev. PENNumbra 141, 151 (2011). "An amount of loss… does not tell us anything about why the defendant committed the offense or how much she personally benefited. These motive-based facts are important for issues of retribution, deterrence, and the need for incapacitation." *Id.* A former staff attorney at the U.S. Sentencing Commission recently wrote, "[D]ecreasing the now-central role loss has in sentencing economic crimes is imperative…. Until then, courts and practitioners are well advised to look critically, and indeed skeptically, on the sentencing advice given by the Guidelines that are influenced by loss." Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, Federal Sentencing Reporter 26 (2013).

### C. The Fraud Guidelines have been widely discredited.

Judges across the country have noted the severe flaws in the fraud Guidelines. These Guidelines are not "heartlands" contemplated by *Rita*, 551 U.S. at 351. In fiscal year 2012, sentences below the guideline range were imposed in 47.5% of all fraud cases; 23.7% were government-sponsored, 23.8% were non-government sponsored. *See* U.S. Sent'g Comm'n, *2012 Sourcebook of Federal Sentencing Statistics*, tbl.27. "[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance." *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y.

2008); *see also United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) (noting that the "Guidelines were of no help.").

Judge Frederick Block notably derided the severity of loss-driven sentences as "a black stain on common sense." *Parris*, 573 F. Supp. 2d at 751. Other judges have recognized this as well. *See United States v. Corsey*, 723 F.3d 366, 377-78 (2d Cir. 2013) (the loss table is "fundamentally flawed" and "valueless."); *United States v. Gordon*, 710 F.3d 1124, 1164 (10th Cir. 2013) (noting that ranges specified by the securities fraud Guidelines "are patently absurd on their face."); *United States v. Faulkenberry*, 759 F. Supp. 2d 915, 928 (S.D. Ohio 2010), aff'd, 461 Fed. App'x 496 (6th Cir. 2012) ("As has become common among district courts sentencing white-collar offenders in financial fraud cases, the Court finds that the loss calculation substantially overstates the gravity of the offense here and declines to impose a within-Guidelines sentence."); *Gupta*, 904 F. Supp. 2d at 351 (Guidelines "reflect an ever more draconian approach to white collar crime, unsupported by empirical data.").

"[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

A variance is necessary to do justice in this case, and will also contribute to the evolution of responsible guidelines. As the Supreme Court emphasized, when judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the Guidelines constructively evolve over time, as both Congress and the Commission foresaw." *Rita*, 551 U.S. at 357-58.

V.     **The Need to Provide Just Punishment, Deterrence, and Protect the Public**

A sentence of probation, even though not imposing incarceration, would be a severe sentence in this case, serving to deter Ms. Hall and the public. Prior to this offense, Ms. Hall was a decorated veteran who spent most of her adult life serving her country and community. Now she is a convicted felon struggling to make ends meet and keep her family afloat. Ms. Hall has never spent a day in jail. The idea of being a convicted felon on probation will provide an effective deterrent from the commission of future offenses. As the Second Circuit noted, a defendant who has previously been sentenced to minimal incarceration, might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001).

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see*

*also Restorative Justice* at 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Valerie White, Ph.D., *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project 4 (November 2010) (citing Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999)). The report, commissioned by the British Home Office, conducted a review of research on major studies of deterrence. Their 1999 report concluded that "...the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." *Id.*

Research regarding white-collar offenders in particular *found no difference in the deterrent effect of probation and that of imprisonment. See Specific Deterrence* at 587 (1995); *see also Restorative Justice* at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

The Court must be cognizant of not being too heavy-handed with its sentence. Incarceration will render her children motherless for that period of time, and will interrupt her precarious employment situation, further imperiling her ability to make full

15

restitution. A period of probation with home confinement attains all of the goals of sentencing, and is thus sufficient, but not greater than necessary, in this case.

## **CONCLUSION**

WHEREFORE, for the aforementioned reasons, Ms. Hall respectfully requests the Court sentence her to a period of probation with home confinement, and waive interest in her restitution obligation.

Respectfully submitted,
CINDY HALL
By Counsel

HARRIS & CARMICHAEL, PLLC
/s/
Phoenix Harris, Esq.
Virginia Bar No. 76009
Jessica N. Carmichael, Esq.
Virginia Bar No. 78339
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 684-7908
(703) 647 6009 (fax)
pharris@harriscarmichael.com
jcarmichael@harriscarmichael.com

## **CERTIFICATE OF SERVICE**

I, hereby certify, that on the 1 day of June, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties to this action.

                                                                                                                                              _____/s/_____
                                                                                                                                              Jessica N. Carmichael, Esq.
Virginia Bar No. 78339
Phoenix Harris, Esq.
Virginia Bar No. 76009
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 684-7908
(703) 647 6009 (fax)